UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Crim. No. 12-15-GFVT |
| V. | ) | Crim. No. 12-13-GFVT |
| | ) | Crim. No. 12-14-GFVT |
| DAVID JASON JENKINS, | ) | |
| ANTHONY RAY JENKINS, | ) | |
| MABLE ASHLEY JENKINS, | ) | **SENTENCING MEMORANDUM** |
| AND ALEXIS LEEANN JENKINS, | ) | **OPINION** |
| | ) | |
| | ) | |
| Defendants. | | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

On April 4, 2011, Anthony Ray Jenkins, David Jason Jenkins, Mable Ashley Jenkins and Alexis Leeann Jenkins, kidnapped Kevin Pennington.  Without trial or due process, they sentenced him to a short period of detention in their truck followed by a beating on the mountains of Kingdom Come State Park.  Ashley and Alexis claim they targeted Kevin Pennington because of his sexual orientation.  And though it has been the topic of much discussion, for Anthony and Jason Jenkins it no longer matters why.  For the roles have been reversed.  Now, it is they who are detained and transported before this Court against their will so that a sentence may be imposed.  And now, in determining the duration of their detention, it does matter why.  For unlike their captive, they have been the benefactors of the rule of law, institutions of justice, and due process.  Therefore, the Court, having heard substantial argument and having reviewed the entire record, issues this Memorandum Opinion and Order setting forth the sentences, along with their justifications as to each Defendant.

**I**

What became the country's first prosecution of a hate crime on the basis of sexual orientation began quietly in the hills of Harlan County, Kentucky.  Anthony Jenkins, his wife Alexis Jenkins, his sister Ashley Jenkins, and his cousin Jason Jenkins, traveled together to the house of Kevin Pennington.  A myriad of admitted lies and contradictory stories obscure the actual reason for the visit.  In their version of the events, which has been the product of several documented revisions, Alexis and Ashley have admitted that the Jenkinses came to Kevin Pennington's house to inflict a physical assault because of his sexual orientation.  These women advanced this testimony as witnesses against Anthony and Jason, but the results of that trial suggest that this narrative was rejected by the jury.

The Defendants, though having also waivered over time in their rendition of these events, argued at trial that the visit constituted nothing more than drug addicts seeking drugs.  Whether or not it was drugs that brought the Jenkinses to Kevin Pennington that night, the role of drugs in their encounter cannot be overlooked.  Aside from Anthony Jenkins, each of the defendants were heavily addicted.  Alexis and Ashley testified that they had ingested significant amounts of potent controlled substances on the night of the criminal activity.  Jason Jenkins claims to have consumed thirty beers the same day.  Even the victim, Kevin Pennington, admitted to significant drug abuse, and his involvement in the distribution of controlled substances.

Pennington has testified that he initially entered the truck with the defendants because Ashley and Alexis, who he knew and trusted, deceived him into believing that they were going to travel to the home of Wes Tippett to acquire a suboxone strip.  Based on the representations of Ashley and Alexis, Pennington claims to have believed that the others in the truck were their boyfriends.  The Government introduced evidence at trial that darkness, window tint, and

2

clothing items rendered Pennington unable to see the true identity of Anthony and Jason upon entering the truck. According to Pennington, he only identified Anthony and Jason when Alexis turned on the dome light of the truck. He maintains that he would not have gotten in the vehicle had he known that Anthony and Jason were there because he feared them from a previous encounter wherein his friend was assaulted. Pennington testified that when he learned of the presence of the Jenkins men, he asked to be let out of the truck, but his request was denied. He pleaded with Ashley, his friend who was in the back seat with him, to intervene on his behalf, but she also refused. The Jenkinses altered their course, and instead of continuing to Wes Tippet's house, they traveled to Kingdom Come State Park until a downed tree stopped their journey at the location of the assault.

It should be noted that Anthony and Jason recall these events very differently than Pennington. They introduced evidence at trial that the truck changed course based on a discussion related to Wes Tippett's involvement and cooperation with police investigations. In their version of the events, the passengers of the car entered into a drug dispute with Pennington over Tippett, which boiled over into the events that occurred at Kingdom Come State Park. Either way, none of the parties dispute that when the truck stopped, Pennington was pulled out of the vehicle and was physically assaulted by Anthony and Jason Jenkins. The two male Jenkinses used their hands and feet to inflict injury on Pennington. Pennington testifies that both defendants were wearing steel-toed boots, although other evidence suggested that one or both of them were wearing tennis shoes. As the Jenkins men were causing physical injury to Pennington, Alexis and Ashley shouted homophobic slurs.

Though at some point Pennington appears to have lost consciousness, he was able to perceive a break in his assault. When the Jenkinses went to their truck for a tire iron to use

3

against Pennington, he ran to the edge of the road and jumped off into the woods in an attempt to escape and hide from his assailants.  Though Pennington could hear them looking for him, the Jenkinses ultimately left him for dead, at which time Pennington ran to the ranger station to find help.  He called 911 and was taken to the hospital for treatment of his injuries, which included swelling, lacerations, and bruising to the face, arms, legs, shoulders, ribs, back, and ankle.

The Jenkinses, on the other hand, were arrested and taken to jail.  State officials charged Anthony and Jason with attempted murder, while Ashley and Alexis were charged with conspiracy to assault second degree.   These state charges, however, were dismissed and the case was certified for federal prosecution pursuant to 18 U.S.C. § 249(b)(1).  The United States filed its Indictment against Anthony and Jason Jenkins on April 11, 2012, charging them with conspiring to kidnap Pennington in violation of 18 U.S.C. § 1201(c), kidnapping Pennington in violation of 18 U.S.C. § 1201, and willfully causing bodily injury to Pennington because of his actual or perceived sexual orientation in violation of the Hate Crime Prevention Act, 18 U.S.C. §249(a)(2).  Alexis and Ashley Jenkins were also charged for federal crimes including aiding and abetting kidnapping under 18 U.S.C. § 1201(a)(1), as well as aiding and abetting the willful causing of a bodily injury because of actual or perceived sexual orientation in violation of the Hate Crime Prevention Act, 18 U.S.C. § 249(a)(2).

Relatively quickly after being charged, Ashley and Alexis indicated their intent to plead guilty to all charges against them and did so on April 10 and April 11, 2012, respectively.  Not to be overlooked, with those pleas the United States convicted its first ever defendants for violations of the sexual orientation basis of the Hate Crime Prevention Act.  The Jenkins men, on the other hand, plead not guilty to both charges.  A lengthy trial followed.  On October 25, 2012, the jury found Anthony and Jason guilty of kidnapping and conspiracy to kidnap, but acquitted

them of the Hate Crime charges.

Because of the unique circumstances of the case and the complex nature of the relationship between these defendants, this Court held a preliminary sentencing hearing to allow the parties to object to the Presentence Investigation Report and discuss the application of the sentencing factors set forth in 18 U.S.C. § 3553(a).  *See United States v. Cunningham*, 669 F.3d 723 (6th Cir. 2012).  The defendants were given the opportunity for allocution and the victim was given the opportunity to inform the Court about the impact that these traumatic events had on his life.  Having heard those arguments and having reviewed the Presentence Investigation Report, as well as all documents submitted by the parties, including letters submitted on behalf of the some defendants and the victim, the Court now, for the reasons that follow, imposes a sentence in the case of Anthony, Jason, Alexis, and Ashley Jenkins.

## II

When imposing a sentence, district courts are, "guided by the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005) (citing *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 764–65, 160 L.Ed.2d 621 (2005)).  Section 3553(a) mandates as follows:

> The court, in determining the particular sentence to be imposed, shall consider--
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed…(3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [under the sentencing guidelines]… (5) any pertinent policy statement…(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553(a).  Informed by the these factors, the Court's sentence must be:

> Sufficient but not greater than necessary (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  Guided by the factors and in light of these purposes, the Court is tasked with crafting a sentence that is reasonable and articulating specific findings in support of that imposed sentence.  *Jackson*, 408 F.3d at 304 (citing *Booker*, 125 S.Ct. at 765); *See also United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007) ("the district judge must make an individualized assessment based on the facts presented and upon a thorough consideration of all of the § 3553(a) factors.") (internal quotations omitted).  With these standards in mind, the Court shall consider their application to each defendant in turn.

### A

### 1

With regard to David Jason Jenkins, the Court first considers the sentencing ranges as established under the United States Sentencing Guidelines, as well as any policy statements issued by the United States Sentencing Commission.  Under the post-*Booker* sentencing scheme "district courts are required to consider the applicable Guidelines sentencing range when arriving at a defendant's sentence, 18 U.S.C. § 3553(a)(4), but only as one factor of several laid out in § 3553(a)." *Jackson*, 408 F.3d 301, 304 (citing *Booker,* 125 S.Ct. at 764, which states "Without the 'mandatory' provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.").

Toward this end, the Court has directed the United States Probation Office to prepare a Presentence Investigation Report (PSR) for David Jason Jenkins.  In computing the offense level,

the PSR identifies U.S.S.G. §2A4.1 as the appropriate Guideline for convictions under 18 U.S.C.

§ 1201(a)(1), with which a conviction under 18 U.S.C. § 1201(c) can be properly grouped

pursuant to the rules found at U.S.S.G. 3D1.2(a).  Section §2A4.1(a) provides a basic offense

level of 32, along with several enhancements depending on the specific offense characteristics.

The PSR includes a two level enhancement under U.S.S.G. §2A4.1(b)(2)(B) for serious bodily

injury and use of a dangerous weapon under U.S.S.G. §2A4.1(b)(3).  The calculation also

includes a two level adjustment for obstruction of justice, U.S.S.G. §3C1.1.  In light of the base

offense and the enhancements, the total offense level proposed by the PSR is 38.  David Jason

Jenkins's long criminal history score of nine establishes a criminal history category of IV.  With

a total offense level of 38 and a criminal history category of IV, the range proposed by the

Guidelines is 324 to 405 months.

At the preliminary hearing, David Jason Jenkins indicated that he had reviewed the PSR

with his counsel and understood it.  However, through counsel he raised several objections to

how the Guidelines were calculated in the PSR.  Specifically, he objects to the enhancement for

obstruction and joins in the objections made by Anthony Jenkins to the enhancements for serious

bodily injury and use of a dangerous weapon.  David Jason Jenkins also made objections to

certain facts as set forth in the PSR.  The factual objections have been made part of the record

which this Court has considered, and the Court now turns to the merits of each substantive

sentence enhancement raised by Jason Jenkins.

**a**

Pursuant to U.S.S.G. §2A4.1(b)(2)(B), if the victim sustained "serious bodily injury," the

base offense level should be increased by two levels.  "Serious bodily injury" is defined

elsewhere in the Guidelines commentary as an "injury involving extreme physical pain or the

protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G §1B1.1 comment n. 1(L). This can be contrasted to "bodily injury," which the commentary to the Guidelines defines as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G §1B1.1 comment n. 1(B). There is no provision made in U.S.S.G. §2A4.1 for an enhancement for an injury that only reaches the level of a "bodily injury."

The Sixth Circuit has previously found that a defendant that repeatedly raped a victim, who was found lying in the fetal position and who required medical intervention in the form of a vaginal examination, could rightfully have been found to have caused serious bodily injury. *United States v. Tipton*, 11 F.3d 602, 610 (6th Cir. 1993). Despite the severity of that injury, the Sixth Circuit did not appear to espouse an exceedingly high bar for a serious bodily injury, noting that it is "unlikely that the Sentencing Commission intended this particular enhancement to be withheld in all but the most extreme cases of serious bodily injury." *Id.* (citing *United States v. Newman,* 1991 WL 63625, at *4, 1991 (6th Cir. April 23, 1991)).

In *United States v. Thompson*, the Eighth Circuit found that a two level enhancement for serious bodily injury was proper because, the "injury required both hospitalization, albeit briefly, and involved the impairment of his mental faculties when he was knocked unconscious." 60 F.3d 514, 518 (8th Cir. 1995). The Fifth Circuit has recently had the occasion to consider the specific enhancement under 2A4.1(b)(2)(B) in the context of a kidnapping case. In *United States v. Garza-Robles*, the Court found that the victim had experienced pain sufficient to make application of the enhancement plausible when the victim, "had been assaulted repeatedly resulting in a broken rib, bruised buttocks, and cuts behind the ears." 627 F.3d 161, 169-70 (5th

8

Cir. 2010).

After being kidnapped and assaulted by the Jenkinses, Kevin Pennington jumped from a mountain to avoid what he perceived to be his impending death at the hands of the cousins. The evidence shows that Pennington lost consciousness during the altercation and sustained injuries that required transportation by ambulance to the emergency room. Medical records from the hospital visit identify the location of Pennington's injuries as the head, chest, back, face, L/R upper extremity, L/R lower extremity, neck, and ear. The clinical impression listed a right ankle sprain, multiple abrasions/contusions, and a closed head injury. Pennington testified that he sustained bruising, scratches, a torn ear, a boot print to his face, a broken tooth, blacktop embedded in his head, and an injury to his ankle that confined him to crutches with a splint for two months, remaining painful and discolored for as long as six months. Pennington also characterized the physical pain resulting from these injuries as a nine out of ten. Further, from Pennington's 911 call and his testimony at trial, it was clear that he experienced an extreme emotional reaction, and according to his victim impact statement, he continues to have lasting emotional and psychological effects from the incident.

Though Kevin Pennington's injuries make this a somewhat close case, they are significant enough to constitute a serious bodily injury within the purposes of this enhancement. The injuries suffered by Pennington are perhaps not as severe as those suffered by the victims in the Sixth Circuit rape cases, but they are in line with similar injuries deemed to be a "serious bodily injury" by other circuits. Pennington's testimony reasonably suggests that he suffered extreme pain, that he lost consciousness, and that he suffered protracted impairment of his ankle. The Jenkinses did not merely lure Pennington in their car for a forced joy ride and then drop him back off at his home. They took him to the top of the mountain and beat him until he jumped off

to escape, causing damaging injuries of extended consequence.  This specific offense characteristic makes this more severe conduct than a basic kidnapping, and thus the enhancement for severe bodily injury under §2A4.1(b)(2)(B) is appropriate.

**b**

Next, is the objection to the application §2A4.1(b)(3).  This provision provides that if a "dangerous weapon" was used in the course of the kidnapping, the base offense level should be increased by two levels.  The commentary explains that a "dangerous weapon" has the meaning given it in U.S.S.G §1B1.1(Application Instruction), which states as follows:

> "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G §1B1.1 comment n. 1(D).  In U.S.S.G. §2A2.2, the Sentencing Commission goes on to note that a dangerous weapon "includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury." U.S.S.G. §2A2.2.[1]

The Sixth Circuit recently interpreted enhancements for dangerous weapons in *United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012), upholding a district court's determination

---

[1] In full, U.S.S.G. §2A2.2 commentary n. 1 states, "'Dangerous weapon' has the meaning given that term in §1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury."  It is somewhat ambiguous from the text whether the Sentencing Commission was expanding the definition of "dangerous weapon" or simply further clarifying it.  However, both the United States and the Probation Office approached the cases interpreting §2A2.2 as applicable to dangerous weapons generally.  Neither of the Defendants produced a reason that this is improper, nor has the Court found one.  Most importantly, the Sixth Circuit has applied the functional test associated with §2A2.2 more broadly, including to other Guidelines that, like §2A4.1, define "dangerous weapon" according to the definition initially stated in §1B1.1.  *See United States v. Tolbert*, 668 F.3d 798, 801 (6th Cir. 2012) (citing *United States v. Rodriguez*, 301 F.3d 666, 668 (6th Cir.2002)).

that a water pitcher could be considered a dangerous weapon under the Guidelines.  In that case, the Sixth Circuit noted that the relevant factor was not whether an actual serious bodily injury occurred but "whether a reasonable individual would believe that the object is a dangerous weapon [*i.e.,* capable of inflicting serious bodily injury] under the circumstances."  *Tolbert*, 668 F.3d at 801 (citing *United States v. Rodriguez,* 301 F.3d 666, 668 (6th Cir.2002).  This analysis takes the form of a functional approach that examines how the particular object was used under the circumstances. *Id. (*citing *United States v. Perry,* 284 Fed.Appx. 56, 57 (4th Cir.2008)).  Notably, the Court favorably cited the determination of the Second Circuit that "[I]n the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, *tennis shoes*, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs." *Id.* (citing *United States v. Matthews,* 106 F.3d 1092, 1095 (2nd Cir.1997)) (emphasis added).  The court then approved of the district court's application of the standard, stating:

> The district court correctly applied this kind of functional analysis, looking at the circumstances in which the water pitcher was used, when it ruled on Tolbert's objection. Contrary to Tolbert's assertions, it was not mere conjecture for the district court to conclude, based on evidence of the characteristics of the water pitcher—including its hardness, size, shape, and weight, the circumstances in which it was used (to strike someone in the head), and common experience, that this object was capable of inflicting serious bodily harm, even though no such harm actually resulted. The district court did not clearly err in concluding that the water pitcher constituted a dangerous weapon under these circumstances and that Tolbert's use of the pitcher to strike Thompson in the head provided sufficient evidence of his intent to inflict bodily injury. The application of the four-level enhancement for use of a dangerous weapon was therefore justified.

*Id.*

After the Jenkinses trapped Kevin Pennington in their car, they took him to the top of a mountain in Kingdom Come State Park and assaulted him.  Kevin Pennington testified that

11

Anthony and Jason threw him to the ground and began kicking him and stomping on his head to the point that he briefly lost consciousness.  The preponderance of the evidence at trial suggests that at least one of the Jenkins men was wearing steel-toed mining boots at the time of the assault.  Alexis Jenkins testified that Jason Jenkins was wearing such boots earlier in the day, and Kevin Pennington and Ashley Jenkins testified that at least one of the Jenkinses was wearing steel-toed boots as they delivered the blows.  Further, an officer testified as to the presence of a boot print on Kevin Pennington's head.  Steel-toed boots are certainly instrumentalities capable of inflicting serious bodily injury, and were used to do so in this case.  It is difficult to deny that using steel toed boots to force someone to stay where you want them or inflict a beating is more egregious and dangerous than doing so with one's bare hands.  Thus, the dangerous weapon enhancement is appropriate.  Though the evidence suggests that Jason was the one wearing the boots, it is unnecessary for the Court to make that determination, as calculating the relevant conduct under the Guidelines includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and in the case of jointly undertaken criminal activity…all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. §1B1.3(a)(1)(A)-(B).  That the evidence shows either of the Jenkins men wore the steel-toed boots is sufficient to impute their use to the other Jenkinses.

However, regardless of the type of footwear, additional trial testimony showed that kicking and stomping was so loud that the impact was audible and serious bodily injuries resulted, including a shoe print of some kind on Pennington's face.  This type of behavior is not in the nature of rough housing boys, but is characteristic of an attempt to inflict serious bodily harm, confirmed by the jeers uttered during the beating.  Under the functional approach espoused

12

by the Sixth Circuit, the United States has proven that whether or not the shoes of the Jenkinses were steel-toed, their use in the beating was enough to carry out the intent of their owners to inflict a serious bodily injury.  Thus, under either rationale, the two level enhancement for use of a dangerous weapon applies.

This conclusion is not undermined because shoes are not often considered insidious devices of torture.  The Jenkinses argue that kicking with boots or shoes is different than using a gun or a knife to kidnap Kevin Pennington.  In fairness, the majority of the cases discussing the use of a deadly weapon to kidnap someone involved the defendant's use of an object with at least the appearance of a gun or knife to compel the victim to go or stay somewhere against their will.  *See, e.g, United States v. Coyle*, 309 F.3d 1071 (8th Cir. 2002) (where the defendant held a knife to the leg of a victim to induce compliance).  However, the argument of the Jenkinses appears to suggest that a crime where a knife or gun is used to coerce a victim into a vehicle but never used to harm the victim is worse than one where the kidnapping included the use of a more innocuous and common object to beat the victim into compliance and cause serious bodily injury.  Specific offense characteristics allow for an enhancement to a base level offense when a particular aspect of that crime makes it worse than it otherwise could be.  The Guidelines appear to contemplate that a kidnapping is worse when some instrument that is capable of inflicting serious bodily injury is used by a defendant who is intending to cause those injuries.  As those are the circumstances present in this case, whether it was shoes, boots, or a tire iron, the enhancement for a dangerous weapon is applicable.

**c**

Jason Jenkins also objects to the PSR's assessment of an enhancement for obstruction of justice under U.S.S.G. §3C1.1.  Concerning conduct that obstructs or impedes the administration

13

of justice, the Guidelines state:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. §3C1.1.  In the commentary to the above rule, the sentencing commission includes examples of obstructive behavior, which includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  U.S.S.G. §3C1.1 commentary n. 4(A).  Another example includes, "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction."  U.S.S.G. §3C1.1 commentary n. 4(B)

At the preliminary hearing, the United States called Connie Jenkins as a witness.  She testified that Jason called her from jail hours after the offense and when she asked if the dispute arose over drugs, he told her they assaulted Pennington because he was gay.  When Connie Jenkins was called to testify before the grand jury on March 22, 2002, she claims that Jason tried to encourage her not to go and tried to tell her what to say.  Specifically, he told her to testify that the altercation occurred as a result of a drug deal rather than due to the Pennington's sexuality.  Connie testified that she interpreted this as an attempt by Jason to cause her to lie to the grand jury.  When Connie did decide to appear before the grand jury and testify, Jason insisted on accompanying her even though it was a violation of state court restrictions.  Joyce Hoskins, the sister of Connie Jenkins, also testified at the preliminary hearing.  Hoskins drove Connie and Jason to London on the day Connie was subpoenaed to testify before the grand jury.  She testified that Jason repeatedly told Connie that the incident resulted from a drug deal, a fact that

14

would favor him.  Further, Hoskins noted that Jason's very presence was intimidating and frightened Connie because Jason had physically abused her in the past.

This is clearly obstructive behavior.  Jason first attempted to persuade Connie Jenkins not to testify before the grand jury, and when he could not stop her he fed her a story that was in direct contradiction to his prior statement.  Further, Jason Jenkins, who has been physically abusive to Connie in the past, accompanied Connie to the courthouse to meet with the grand jury in a clear act of intimidation.  Therefore, Jason Jenkins's objection to obstruction is overruled and a two level enhancement is appropriate.

Therefore, the Court finds the PSR for Jason Jenkins as calculated by the Probation Office is correct, and the clerk shall be directed to file the PSR under seal in order to protect the privacy of the Defendant.  With a base level offense of 32, increased by three separate two point enhancements, and considered in context of a category IV criminal history, the relevant Guidelines range for Jason Jenkins is 324 to 405 months.

**2**

The Court's consideration of policy statements from the United States Sentencing Commission informs the consideration of the guideline recommendation.  Both parties argue that this case ought to be viewed as something other than how it was charged.  According to the Defendants, the actual conduct in this case is akin to a state assault charge, which would render a much lower sentence.  The United States counters that the actual conduct is more like an attempted murder charge and should be considered to be more severe than an ordinary kidnapping.

The Sentencing Commission has addressed the academic and philosophical debate of the parties in Policy Statement 4(a), which discusses "real offense vs. charged offense sentencing."

15

The Commission notes that one of the most important questions it faced in crafting the Guidelines was "whether to base sentences upon the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted ('real offense' sentencing), or upon the conduct that constitutes the elements of the offense for which the defendant was charged and of which he was convicted ('charge offense' sentencing)." *Id*. The commentary goes on to note that the commission sought to create a real offense system, but practical limitations caused them to move closer to a charge offense system. Nevertheless, using "real offense elements" the Commission was able to provide some flexibility from the charged offense to reflect the actual conduct.

The United States did not charge the Jenkinses with assault or attempted murder. The charge was for kidnapping, and thus the relevant guideline for that offense applies. However, the Court may consider the real conduct in adjusting the offense level to reflect what actually occurred. That certainly seems to be the hallmark of a just and fair sentencing scheme. Here, as has been discussed above, the Jenkinses engaged in conduct that was worse than a common kidnapping. They inflicted serious bodily injury using instruments that could rightfully be considered dangerous weapons. Further, they attempted to obstruct and impede the investigation of the government by intimidating witnesses and attempting to influence their testimony. The enhancements accepted by the Court help reflect the increased severity of that actual conduct in this case. And though this might not provide the Court with as much latitude as argued for by either party, it is the limit to the flexibility permitted by the Guidelines in this step in the analysis.

**3**

The third factor that the Court considers is "the need for the sentence imposed to --

16

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 28 U.S.C. § 3553(a)(2).

In some cases, such as manufacture or distribution of controlled substances, the seriousness of the offense requires some careful explanation, as the harm that such substances bring to a community might not be immediately apparent. The seriousness of this offense, however, is obvious from the face of the facts. Anthony and Jason Jenkins held Kevin Pennington captive, drove him to a secluded location, and then assaulted him, causing serious bodily injuries. The taking of someone's liberty and violently inflicting harm is a flagrant affront to the rights of another and shows a clear disrespect for the law. As a result, a correspondingly serious punishment must be levied in this case to match the severity of the crime. A just punishment can be adequately conceptualized by the old notion of the debt one owes to society. As a result of his conduct, Jason Jenkins has harmed the community in a substantial way, and he therefore owes a sizeable debt for those past transgressions. The sentence must be fashioned in such a way to reflect that debt.

The sentence must also be crafted in a manner that promotes respect for the law and deters future conduct. The community needs to understand that there are severe consequences for committing this crime. Though it is sad to have to conclude that someone needs to be detained in order to protect the public, as shall be discussed below, David Jason Jenkins is a violent man with a lengthy criminal history. One thing that can be certain is that during his long period of detention he will be unable to kidnap or violently assault another member of the

17

community.

There can be no doubt that the debilitating effects of drugs and alcohol played a leading role in this offense for David Jason Jenkins.  Large portions of the trial evidence related to the intense alcohol and drug use of the defendants in their daily lives and at the time of the criminal conduct.  In fact, there is substantial evidence in this case that the entire dispute resulted from the need of the defendants to acquire more drugs to feed their destructive habit.  Through counsel, Jason Jenkins has admitted that he has a problem with addiction to these substances.  Though Jason Jenkins faces a lengthy period of detention, this will allow him to participate in the Bureau of Prisons drug and alcohol rehabilitation programs.  Programs will also be required during his period of supervision if needed.

**4**

The fourth factor of the §3553 analysis requires the Court to consider the history and characteristics of the  person standing in front of it, as well as the nature and circumstances of this specific crime.  Having presided over the trial, the Court is very well aware of all of the circumstances that took place here and has described the events several times herein.  David Jason Jenkins and Anthony Jenkins confined Kevin Pennington to a truck against his will.  He pleaded to be let out of the vehicle, but they refused.  The Jenkinses transported him to a remote mountain in Kingdom Come State Park, where they beat him, taunted him with homosexual slurs, and threatened to kill him.  The evidence suggests that they only stopped the beating upon deciding that a tire iron in the truck would hasten his pain and potentially even his death.  Kevin Pennington testified that he would rather jump over a cliff and face the unknown dangers that lay beneath than to trust his fate to the hands of the Jenkinses.  In short, this was a serious and violent conspiracy and kidnapping.

18

However, it is critical to note that according to the factual findings of a jury, this was no more or no less than that, a conspiracy and a kidnapping. It is unlikely that this conspiracy and kidnapping would have captured headlines across the nation nor the direct attention of justice department officials in Washington D.C. had it not been for the charged violation of the Hate Crime Prevention Act, the first of its kind on the basis of sexual orientation. The Hate Crime Prevention Act charges have no doubt added elements of social and legal intrigue to this case, but the Court does not in any sense enhance the sentence of Jason or Anthony Jenkins because of those charges. The jury has found in accordance with the evidence that the Government did not prove the specific reason for this crime beyond a reasonable doubt. While elements of hatred and bigotry exist, it is the violent kidnapping that drives the guideline recommendation and informs the Court's final decision.

The Defendants vehemently argue that the Court should take into consideration that had the hate crime charges not have been involved, a long and different causal chain of events would have transpired that began with an assault charge and ended with a substantially shorter state court sentence. As acknowledged by Jason Jenkins's counsel in his sentencing memorandum, "It is undeniable that the original offense was prosecuted in state court as an *attempted murder* and that the Defendant David Jason Jenkins was offered upon a plea a *twenty year sentence*, which was then rendered null and void by the presentation of this case to the Grand Jury as a hate crime." [R. 175] (emphasis added). Attempted murder under KRS 506.010 is a Class B felony, which is punishable from 10 to 20 years of imprisonment under KRS 532.060. Interestingly, the base level offense for the kidnapping charge provides a similar range as attempted murder, 168-210 months. Further, had the defendant entered into a guilty plea with federal prosecutors as he suggests he could have with state officials, an additional three levels would have likely been

19

subtracted for acceptance of responsibility.  All of that is said to demonstrate that the disparity in the nature of the crime charged in state court and the convictions obtained in federal court are not as significant as suggested.  True, as discussed, the Sentencing Guidelines have ultimately provided a higher sentencing range for Jason than permitted under the state attempted murder statute, but that does not so much reflect the disparity in charged offenses as the enhancements for serious bodily injury, use of a dangerous weapon, and obstruction of justice.

Ultimately, the Court sees little that can be gained from engaging in these speculative discussions of what might have been.  The reality of the situation is the Jenkinses did face federal prosecution, they were charged with violations of federal law, and they were convicted of federal conspiracy and kidnapping.  Therefore, in considering the nature and circumstances of the offense,  the court shall neither enhance the severity of the sentence by adding time for the Hate Crime Prevention Act violations for which they were acquitted, nor reduce the sentence by subtracting time to comport with state law charges that were either never pursued or were dismissed.  The crime is a kidnapping involving conspiracy and serious injuries to the victim caused by a dangerous weapon and enhanced because subsequent obstruction of justice– no more and no less.

And while Jason Jenkins's sentence will not be enhanced for crimes that he did not commit, the sentencing factors of Section 3553 does require the Court to consider the past crimes and actions that he did.  And those past transgressions are legion.  According to the PSR, in 1998, while in the course of committing theft, David Jason Jenkins used a knife to cut the neck of a victim.  He was shock probated, but his shock probation was later revoked and he served an additional period of detention.  In March of 2003 he was granted parole and was released into the community.  Over the next six months after his release, David Jason Jenkins was cited for

20

alcohol and/or controlled intoxication in a public place on four separate occasions.

Even more troubling are the circumstances surrounding the alleged violence of David Jason Jenkins against Angela Burke during his period of probation.  Burke attended the preliminary hearing and testified that she has known Jason since her childhood and that he had even been her first date.  They maintained a relationship over time and in 2003, Burke says the two went out for drinks at a bar and returned to his house.  At the hearing she stated, "We proceeded to go to the bedroom, sit on the bed and that's when he told me he had something for me. And he reached up in the bed and pulled a butcher knife and he cut – ripped my shirt after, cut my bra off, he beat me with a metal baseball bat that belonged to my son, and he proceeded to whoop me all through the trailer."  After Jason beat her, Burke claims that he pulled her on top of the bed and raped her.  Burke called the police and Jason Jenkins was charged with First Degree Rape, Kidnapping, Second Degree Assault, and as a Persistent Felony Offender.  Burke claims that she later dropped the charges at the behest of Jason's grandmother.

Ultimately Jason Jenkins violated his probation and was ordered to finish out his sentence in prison.  He was released in November of 2005, and in less than two months he was charged with two more alcohol related offenses, one of which was for operating a motor vehicle under the influence and resisting arrest when he was pulled over for speeding, failed a sobriety test, and then attempted to run from the police.  In November of 2006, Jason was arrested and charged with domestic violence that he allegedly inflicted against his wife, Connie Jenkins.  At the preliminary hearing, Connie Jenkins testified that Jason frequently abused her when he had been drinking, and on this particular occasion the physical damage was such that she required treatment in the hospital.  Though the charges against him were ultimately dismissed, Connie Jenkins continues to maintain that he was abusive to her and inflicted sufficient injuries to

require hospitalization.

Perhaps the transgression that is the underlying cause of all of those previously mentioned is Jason's use and abuse of drugs and alcohol.  Jason states that he started using intoxicating substances at 14 years old and that he has since tried or experimented with almost every illicit or intoxicating substance available.   As indicated above, most of the crimes Jason Jenkins committed occurred while he was intoxicated.  In fact, by his own admission, at the time of the Kevin Pennington kidnapping he had consumed 30 beers and was en route to a drug dealer to purchase more controlled substances.  Though Jason now indicates his willingness to receive treatment, he has previously abandoned a drug rehabilitation program, a decision which ultimately caused his probation to be revoked in November of 2003.

**5**

In short, Jason Jenkins has been and remains a very violent and dangerous man, who poses a threat to the community.  Despite many interactions with the legal system and short periods of incarceration, Jason Jenkins remains obstinate and refuses to conform his behavior to the acceptable standards required for a safe and orderly society.  The Court has considered all the available options, but Jason Jenkins's conduct is such that incarceration is required to provide a sentence that is both just and removes this defendant from society for a lengthy period to protect the public.

**6**

The Court must also be mindful that similarly situated defendants should be treated the same.  Jason Jenkins should not receive a harsher or more lenient sentence just because he is appearing before this Court.  Thus, this sentence should be significant, but will be within the ranges suggested by the Guidelines to help mitigate against any unwarranted disparity.

22

**7**

Finally, to the extent possible, the victim in this case should be compensated for his injuries.  The PSR assesses the restitution amount at $7,513.81, the amount of medical care costs incurred by Mr. Pennington.  However, at the preliminary sentencing hearing, the United States indicated that additional time would be necessary to arrive at the actual amount of restitution in this matter.  As such, the parties shall have seventy (60) days to inform the Court of an agreement on the issue of restitution or to make a motion for a restitution hearing to set that amount.

With these factors in mind, the Court will now impose the sentence of David Jason Jenkins, and if there is no objection it will be imposed as stated.  Pursuant to the Sentencing Reform Act of 1984 as modified by the subsequent case law, the Court finds the following sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a). Accordingly, it is the judgment of the Court that the defendant, David Jason Jenkins, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 360 months on Count One and 360 months on Count Two, to be served concurrently for a total term of 360 months.[2]

**B**

**1**

Though much of the analysis above applies with equal force to Anthony Jenkins, several factors lead the Court to a different sentence.  Again, the Court first considers the sentencing ranges as established under the United States Sentencing Guidelines, as well as any policy

---

[2] The sentence imposed by the Court in the case of David Jason Jenkins also included a number of additional conditions that were specifically articulated on the record and that shall be incorporated into the judgment.

statements issued by the United States Sentencing Commission.  Toward this end, the Court directed the United States Probation Office to prepare a Presentence Investigation Report for Anthony Jenkins.  Using the same calculations as described above, the Probation Office identified Anthony's base offense level to be 32, increased by three two-point enhancements for causing serious bodily injury, use of a dangerous weapon, and obstruction of justice.  However, unlike his cousin, Anthony has a criminal history score of zero, which establishes a criminal history category of only I.  Thus, with a total offense level of 38 and a criminal history category of I,  the range proposed by the Guidelines is 235 to 293 months.

At the preliminary hearing, Anthony Jenkins indicated that he had reviewed the PSR with his counsel and understood it.  However, through counsel he raised several objections to how the Guidelines were calculated.  Anthony made the original objections to the enhancement for causing serious bodily injury and use of a dangerous weapon, in which Jason Jenkins joined, and which the Court has overruled for the aforementioned reasons.  Anthony also objected to the enhancement for obstruction of justice based on his distinct conduct.  Finally, Anthony made several objections to facts set forth in the PSR.  The factual objections have been made part of the record which this Court has considered, and the Court now turns to the merits of the obstruction of justice enhancement as it specifically applies to Anthony Jenkins.

As discussed, a two level enhancement for obstruction of justice was appropriate for Jason Jenkins.  Though Anthony Jenkins's conduct was different than Jason's, it was no less obstructive.  In fact, in Anthony's case the obstruction is in many ways more obvious.  Letters in the record clearly demonstrate that Anthony tried to convince and pressure his co-defendant and wife, who was a key witness for the United States, not to cooperate with the Government by refusing to testify against him.

There are many examples of obstruction contained just in the letters included in the PSR, and the Court sets forth a few examples herein as illustrative of its conclusion. On August 21, 2012, Anthony wrote to Alexis, "you should not let the Fed scare you in to get up on the stand because you won't get more time if you don't plus it's hurting me babe because they said I could get life if you all do." On August 29, 2012, his letter encouraged her to "watch what you say" and he said, "I just hope you don't really get up on the stand and testify on me babe that would hurt me so bad that would broke what little heart I have left." He went on to suggest that if she did testify against him, it would ultimately result in him hurting himself because he could not endure prison. In another letter Anthony tells Alexis, "remember what I told you if you love me at all just watch what you say babe I wish you just say no your not going to get up and say anything babe." More ominously, one of Anthony's early letters told Alexis, "you better not take 10 year Ive kill you don't do it…" Statements like these are made to intimidate or prey on the emotions of Alexis and cause her not to testify against Anthony at trial. That is the type of behavior that is prohibited under U.S.S.G. §3C1.1, and supports a two level enhancement. Anthony Jenkins's objection and arguments to the contrary are therefore overruled.

Through counsel, Anthony argues that these letters must be considered in context, and are not obstructive because of the low level of functioning of the penman. While Anthony's age and low cognitive abilities are relevant to the sentencing analysis, they are not relevant here. The letters might be of poor grammatical quality, but the intended meaning is calculated and evident. Anthony is very clearly attempting to use every persuasive method at his disposal, including threats, logic, and emotional pleas, to impede Alexis's cooperation with the federal authorities. Anthony goes well beyond simply encouraging his wife not to take a plea deal, as suggested by his counsel. He actively attempts to obstruct her involvement in his case, which justifies a two

25

level enhancement.

Therefore, the Court finds the PSR for Anthony Jenkins as calculated by the Probation Office is correct, and the clerk shall be directed to file the PSR under seal in order to protect the privacy of the Defendant.  With a base level offense of 32, increased by three separate two-point enhancements, and considered in context of a category I criminal history, the relevant Guidelines range for Anthony Jenkins is 235 to 293 months.

**2**

In the case of Anthony Jenkins, it is especially important that the Court not only consider the relevant ranges set forth in the Guidelines, but also the policy statements underpinning those Guidelines.  As will be discussed in more detail with the history and characteristics of the defendant, at the time of the Pennington kidnapping, Jenkins was 19 years old.  Moreover, psychological reports show his IQ score to be in the fourth percentile, indicating that 96 out of 100 individuals would score as high or higher than him.

Pursuant to U.S.S.G. §5H1.1, "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish this case from the typical cases covered by the guidelines."  In addition, U.S.S.G. §5H1.3 provides that, "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  At the time of the offense, Anthony Jenkins was not only very young, but also burdened with very low levels of mental capabilities.  While these do not excuse his conduct, the Court does find it to be an important mitigating factor.

**3**

As noted, the third factor requires the Court to accomplish several different policy goals when choosing a sentence. 28 U.S.C. § 3553(a)(2). The Court has already applied this factor to these circumstances, and as the overwhelming majority of the analysis relates with equal force to Anthony Jenkins, the Court shall not reiterate it here. The crime is no less serious, disrespectful to the law, or deserving of punishment, for example, because Anthony Jenkins committed it. The only major distinction between the co-defendants in this step is that Jason Jenkins's sentence must include some drug rehabilitation, while a sentence imposed against Anthony, who has never struggled with a drug problem, does not. Otherwise, the analysis on this factor is the same, and a substantial period of detention shall be required in order to meet the purposes articulated in Section 3553.

During the preliminary hearing, the defendants were given the opportunity of allocution. At that time Anthony Jenkins apologized to many people including the victim, his family and the Court. The Court does not doubt the sincerity of his apology. However, as a result of his conduct, Anthony Jenkins has harmed the community, and he owes society a debt for those past transgressions. The sentence must be fashioned by the Court to reflect that debt. Simply put, he must receive a just punishment. And though this will involve a lengthy period of detention, due to his youth, Anthony Jenkins will likely have  a large portion of his life left to live after he serves this time. And when he does, he will have paid off that debt to society. People may, and often do, hold the wrongs of defendants over their head, but they have no right to do so, because, though they did wrong, they will have borne the consequences of those decisions, and have every right to live without the burden of the past debt.

**4**

The fourth factor of the Section 3553 analysis requires the Court to consider the  history and characteristics of the person standing in front of it, as well as the nature and circumstances of this specific crime.  The nature and characteristics of the crime charged has been chronicled in detail above, but two issues merit additional consideration.  First, though Anthony Jenkins drove the car, even the United States acknowledged that Jason Jenkins drove this conspiracy.  It is evident that Anthony was significantly and personally involved in both the kidnapping and the beating, but it is notable that Jason Jenkins appeared to assume a more authoritative role in the criminal conduct.

Second, at the preliminary sentencing hearing, counsel for Anthony Jenkins, who has passionately advocated for his client throughout the proceeding, argued fervently that the federal sentence was disconnected from the actual happenings of this case.  In his view, Anthony's conduct is more properly characterized as a "technical kidnapping" but a "substantive assault," and he should therefore be punished for assault.  He then cites to a federal assault statute, 18 U.S.C. § 113(a), which contains a provision for assault resulting in serious bodily injury and is limited by a ten year statutory maximum. 18 U.S.C. § 113(a)(6).  Because Anthony views his actual wrongful conduct as being more akin to assault, Anthony concludes that the assault statute, which would allow for significantly less time than he faces under the kidnapping Guidelines, should be instructive to the Court.

As an initial matter, the Court notes that this has the feel of a jury nullification argument made to the Judge at the time of sentencing.  The Court reiterates that Jason and Anthony Jenkins were charged with kidnapping and conspiracy to kidnap, and the Government introduced sufficient evidence at trial to persuade a jury beyond a reasonable doubt that the conduct of the

defendants constituted kidnapping under the elements of the crime.  In that way, Anthony Jenkins's conduct was not merely a technical kidnapping, but a substantive kidnapping, a crime on which Congress has not placed a ten year maximum sentence.  Further, the Court is not persuaded by the suggestion of Anthony Jenkins that his sentence should be reduced because, essentially, the Jenkinses kidnapping of Kevin Pennington was not good enough to warrant a substantial sentence.  Anthony assisted the others in trapping a victim in a car, taking him to a remote location and beating him there.  As has been previously demonstrated with the enhancements, not only was this a kidnapping, it was a kidnapping that resulted in serious bodily injuries to the victim administered with an object that could be classified as a dangerous weapon.

However, even if Anthony's "technical kidnapping" premise was accepted, doing the same for his "substantive assault" argument requires some selective reading of the assault statutes.  It is certainly true that  some of the assault offenses listed in 18 U.S.C. § 113(a) contain a statutory maximum sentence of ten years.  However, under 18 U.S.C. § 113(a)(1), an "assault with the intent to commit murder" has a twenty year maximum sentence.  Turning to the assault Guidelines, when the object of the offense would have constituted first degree murder, a conviction under 18 U.S.C. § 113(a) corresponds to a base offense level of 33 under U.S.S.G. §2A2.1.  This is not only a higher base offense level, but is also subject to enhancements for serious bodily injury and obstruction of justice.  As previously discussed, the state law charges against the defendants were not for assault, but for attempted murder.  The evidence introduced at trial certainly suggests that at some point the kidnapping evolved into an assault, which progressed into an attempt to take a life.  This conclusion is supported by the discussions between the codefendants, the jeers shouted at the victim, the extent of the beating, and the evidence that suggests that Pennington escaped only when the Jenkinses returned to their truck to

29

get a tire iron.  Thus, even if the assault statute suggested by Anthony Jenkins could be said to apply, it could still have potentially allowed him to be sentenced at the bottom of the kidnapping Guidelines, above which the Court does not intend to impose as a sentence.

And though the nature of the crime might not be mitigating for Anthony Jenkins, his history and characteristics are.  Unlike his cousin, Anthony Jenkins has no criminal history score, and has largely functioned in the community without violating the law.  Moreover, at the time of these events Anthony maintained a job and was a contributing member of society.  Further, Anthony Jenkins reports to having never used any type of illicit or intoxicating substance other than alcohol, which he only consumed on a limited number of social occasions.

The impressive nature of the characteristics above are highlighted when juxtaposed with the difficult circumstances of his young life.  The trial testimony demonstrated that Anthony's family is heavily involved in illegal substance abuse.  Because his parents were indigent and abused prescription medications, Anthony largely lived with his aunt and uncle, Jimmy and Shelia Jenkins.  However, because he lived in close proximity to his biological family, he maintained regular contact with them and therefore did not fully escape their influence.  In 2005, his biological mother was murdered, potentially over narcotic pain pills.  Her murderers disposed of her body over an embankment beside Little Shepherd's Trail, in Kingdom Come State Park, not far from the location of the assault.

At the time of the Pennington kidnapping, Jenkins was 19 years old.  He left high school in the 11th grade, but during that time he was in special education classes.  A psychological report conducted by Dr. Tonya R. Gonzalez indicated that Anthony has an IQ score of 76, which falls in the borderline range of intellectual functioning.  More specifically, this score places Anthony in the fourth percentile, indicating that 96 out of 100 individuals would score as high or

30

higher than him.  According to policy statements in the United States Sentencing Guidelines, age as well as mental and emotional condition may be relevant in determining whether a departure is warranted.  *See* U.S.S.G. §5H1.1 and U.S.S.G. §5H1.3.  At the time of the offense, Anthony Jenkins was not only young, but also burdened with low levels of mental capabilities.  While these do not excuse his conduct, the Court does find it to be mitigating and one of the primary reasons for either a guideline departure or a sentencing factor variance in Anthony's case.

The United States does introduce evidence relative to Anthony Jenkins that gives the Court some pause.  Like David Jason Jenkins, Anthony has been accused by his wife of domestic violence.  The United States has also introduced evidence of other physical altercations in which Anthony was allegedly involved.  The allegations of his wife are disturbing.  The Court cannot take lightly these events, though unlike Jason, this conduct did not result in a conviction.  Nevertheless, it must inform the sentence.

**5**

For the reasons stated this is not a case where alternatives to a lengthy period of detention is appropriate.  Anthony Jenkins's conduct is such that incarceration is required to provide a sentence that is sufficient to comply with the purposes of Section 3553.

**6**

Also like his cousin,  Anthony Jenkins should not receive a harsher or more lenient sentence just because he is appearing before this Court.  Thus, this sentence should be significant, but due to the mitigating factors of his specific circumstances discussed above, will be below the range suggested by the Guidelines.

**7**

Finally, to the extent possible, the victim in this case should be compensated for his

31

injuries.  The PSR assesses the restitution amount at $7,513.81, the amount of medical care costs incurred by Mr. Pennington.  However, at the preliminary sentencing hearing, the United States indicated that additional time would be necessary to arrive at the actual amount of restitution in this matter.  As such, the parties shall have seventy (60) days to inform the Court of an agreement on the issue of restitution or to make a motion for a restitution hearing to set that amount.

Therefore, the Court will now impose the sentence of Anthony Ray Jenkins, and if there is no objection it will be imposed as stated.  Pursuant to the Sentencing Reform Act of 1984 as modified by the subsequent case law, the Court finds the following sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a). Accordingly, it is the judgment of the Court that the defendant, Anthony Ray Jenkins, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 204 months on Count One and 204 months on Count Two, to be served concurrently for a total term of 204 months.[3]

## C

### 1

Ashley Jenkins is the first person in the United States to be convicted under the Hate Crime Prevention Act's prohibition on willfully inflicting bodily injury on another because of sexual orientation.  Specifically, she pled guilty to aiding and abetting the willful causing of bodily injury because of actual or perceived sexual orientation, a violation of 18 U.S.C. §249(a)(2).  As calculated in the Presentence Investigation Report, prepared at the direction of the Court by the United States Probation Office, the Guideline for 18 U.S.C. § 249(a)(2) is found

---

[3] The sentence imposed by the Court in the case of Anthony Ray Jenkins also included a number of additional conditions that were specifically articulated on the record and that shall be incorporated into the judgment.

at U.S.S.G. §2H1.1, and corresponds to a base offense level of 36.  The PSR also includes a three level enhancement under U.S.S.G. §3A1.1 for intentionally selecting a victim based on a prohibited reason, among which sexual orientation is enumerated.  Thus, the adjusted offense total for Court Two of the Information is 39.

Ashley also pled guilty to Count One of the Information, charging her with aiding and abetting kidnapping in violation of 18 U.S.C. § 1201(a)(1).  Pursuant to U.S.S.G. §2A4.1, convictions under 18 U.S.C. § 1201(a)(1) correspond to a base offense level of 32.  As was the case with her male co-defendants, the Probation Office has assessed two level enhancements for serious bodily injury to the victim pursuant to U.S.S.G. §2A4.1(b)(2), and the use of a dangerous weapon pursuant to U.S.S.G. §2A4.1(b)(3).  The PSR also includes the previously mentioned three level enhancement under U.S.S.G. §3A1.1 for intentionally selecting a victim based a prohibited reason.  The resulting adjusted offense level for Count One of the Information is 39.  Because of the relationship between the offense conduct, Counts One and Two are grouped together pursuant to U.S.S.G. §3D1.1.

At the preliminary sentencing hearing, the United States made a motion for a three level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a).  Specifically, this three level reduction reflects the fact that when Ashley decided to plead guilty, she received credit for having accepted responsibility for her crime.  As a result, the recommended sentence in the sentencing scheme that results in the recommendation is less than it would have been had she have gone to trial and been convicted of the same crime to which she plead guilty.  This reduction requires a motion from the Government, and the Court granted that motion at the preliminary hearing.  The three level reduction for acceptance of responsibility was anticipated in the PSR, which calculates a total offense level of 36.  Ashley has a criminal history score of zero,

33

which establishes a criminal history category of I.  Thus, with a total offense level of 36 and a criminal history category of I, the range proposed by the Guidelines is 188 to 235 months.

At the preliminary sentencing hearing Ashley Jenkins indicated that she had reviewed the PSR with her counsel and understood it.  She indicated that she had no objection to the PSR's calculation or to the three enhancements applied.  Concerning the recommended enhancements, the Court has discussed in detail the reasons that adjustments for inflicting serious bodily injury and use of a dangerous weapon are appropriate in this case.  As previously stated, it does not matter that Ashley did not deliver the blows that caused the injury or use the dangerous weapon herself.  Calculating the relevant conduct under the Guidelines includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and in the case of jointly undertaken criminal activity…all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. §1B1.3(a)(1)(A)-(B).  Ashley has pled guilty to aiding and abetting Jason and Anthony in their conduct, and as such, enhancements for the injuries caused and weapons used to cause them apply equally to her.

It is notable, although perhaps mostly as an academic issue, that Ashley's offense level has been enhanced pursuant to U.S.S.G. §3A1.1 for intentionally selecting a victim based on his sexual orientation.  When considered in the context of this opinion, it might seem contradictory that this enhancement could apply to Ashley when a jury essentially rejected its premise at the trial of the male co-defendants.  However, there is nothing logically inconsistent in a jury's determination that the Government failed to meet its burden of proof on a charge against one defendant, which another defendant freely admits.  In addition, while arising from a single event and being discussed in a single opinion, it is critical to remember that this is a separate case than

34

the one that proceeded to trial.  Herein, Ashley Jenkins has testified several times under oath that she targeted Kevin Pennington because of his sexual orientation.  Under U.S.S.G. §3A1.1, a three level enhancement is appropriate if the Court "determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the conviction because of the actual or perceived…sexual orientation of any person." U.S.S.G. §3A1.1(a).  Ashley's previous testimony as to the motivation behind the criminal conduct at issue makes it now difficult for her to object to this enhancement, and is persuasive to the Court that the vulnerable victim enhancement is appropriate in Ashley's case.

The Court finds that the PSR for Ashley Jenkins as calculated by the Probation Office is correct, and the clerk shall be directed to file the PSR under seal in order to protect the privacy of the Defendant.  However, this does not conclude the Court's consideration of the sentencing Guidelines and its policy statements, as the United States has also filed a sealed motion that affects the Guidelines calculation for Ashley Jenkins. [R. 62].  For the reasons stated at the bench during the preliminary sentencing hearing, the Court granted that sealed motion, reducing the total offense level to 31.  When considered in the context of a criminal offense category I, a total offense level of 31 corresponds to a Guidelines range of 108 to 135 months.

**2**

In considering the effect of the policy statements of the Guidelines, the Court notes that Ashley Jenkins was only eighteen years of age at the time of this offense.  U.S.S.G. §5H1.1.  While her youth does not excuse her criminal conduct, the Court does find that the very young age of Ashley Jenkins is a mitigating factor.

**3**

Ashley's sentence also seeks to accomplish several different policy goals.  28 U.S.C. §

3553(a)(2).  It may at first seem that the seriousness of Ashley Jenkins's transgressions is less than her brother and her cousin.  In some ways, that is correct.  After all, the evidence does not suggest that the conspiracy was her idea, and she did not throw one punch or land one kick.  However, on closer inspection, Ashley's role in the kidnapping and hate crime is substantial.  In her own sentencing memorandum to this Court, Ashley Jenkins, through counsel, said, "It must be admitted that in one sense, this incident would likely not have occurred but for the actions of Ashley and Alexis Jenkins, as it was they who tricked Kevin Pennington into getting in the truck with Jason and Anthony.  Frankly, Ashley likely must bear somewhat more responsibility on this point since it is not known how well Pennington knew Alexis but prior to this incident Ashley considered Pennington to be her best friend."  [R. 57 at 251].

It is also true that Ashley's fists or feet did not inflict the injuries that Pennington suffered, but it is accurate to say that the entire event would have been unlikely without her participation.  Because of a previous encounter with his friend, Kevin Pennington feared Anthony and Jason and testified he would not have entered the truck had he known they were inside. However, Kevin Pennington trusted his friend.  By her own admission, Ashley Jenkins tricked Kevin Pennington into getting in the truck, lied to him about her intentions, and deceived him as to who was in the truck.  Once inside the vehicle, it was Ashley Jenkins that Kevin Pennington pleaded with to be released and clung to when being ripped from the truck.  However, Ashley Jenkins did not intervene.  Moreover, when Anthony and Jason began to assault Kevin Pennington, the victim's friend did not attempt to come to his aid, call for help, or reason with her brother and cousin.  Instead, Ashley stood to the side cheering them on as they beat him and jeering her friend with homosexual slurs.

Ashley Jenkins might not have designed the conspiracy to kidnap or thrown the punches

36

that led to the serious bodily injury, but the consequence of her crimes are still serious. As such, though a period of detention that matches her male co-defendants might not be necessary, a lengthy sentence will be required to promote respect for the law and to ensure a just punishment in this case. A just punishment can be adequately conceptualized by old notion of the debt one owes to society. As a result of her conduct, Ashley Jenkins has harmed the community, and she therefore owes debt for those past transgressions. The sentence must be fashioned in such a way to reflect that debt. It must also be clear to the community that to the extent you work to facilitate the commission of serious federal crimes such as kidnapping, you will face serious punishment for aiding and abetting that criminal conduct.

The need to protect the public is also double edged sword for Ashley. On one hand, she has little to no past history with the law and has been steadfast in her position that had she not been under the influence of drugs, she would not have agreed to become involved in this conduct. On the other hand, the PSR reports that after the events that are the subject of this sentencing, Ashley Jenkins was charged with terroristic threatening, harassment, and menacing for accompanying Alexis Jenkins in an encounter with Keli Jo Deal during which Alexis allegedly threatened to "beat her and leave her for dead…just like they did Kevin Pennington." Ashley also allegedly approached Deal aggressively, as if she were going to hit her, putting her in fear. Though these charges were dismissed, this encounter is of concern to the Court as it suggests that Ashley's violent behavior towards Pennington was not an isolated incident.

Further, it provides no reassurance that Ashley may exhibit violence and poor decision making only when under the influence of drugs, as by her own admission she has lived the past several years of her life in a persistent state of drug use. Specifically, at age fourteen she began using marijuana and by fifteen or sixteen she was using barbiturates and opiates. By age

37

seventeen she was injecting herself with ground pills of morphine, Xanax, suboxone, and other drugs.  She used these drugs heavily and frequently, and admitted that she was under their influence on April 4, 2011.  Upon her detention in this case, Ashley went through withdrawal symptoms, but returned to drug use shortly after posting bond.  A psychiatric evaluation conducted in relation to this matter, indicated that the defendant would benefit from drug rehabilitation programs and mental health treatment during her incarceration.  Therefore, while a period of detention is necessary to protect the public from Ashley Jenkins, the Court shall recommend that she receive mental health and drug treatment during that time and during supervised release as needed.

**4**

The fourth factor of the Section 3553 analysis requires the Court to consider history and characteristics of the person standing in front of it, as well as the nature and circumstances of this specific crime.  At this juncture, the criminal conduct that occurred in this case and the critical role that Ashley Jenkins played in the commission of this offense does not need repeating.  Again, Ashley Jenkins was the key defendant in facilitating the assault and kidnapping of Kevin Pennington, which resulted in this victim being transported against his will to a remote location and then beaten and left for dead.  Ashley's primary function was to lure her friend Kevin Pennington into the vehicle, and once that was accomplished, she callously refused his pleas for help. Moreover, Ashley jeered Pennington with homosexual slurs while he was being assaulted. That she did not lead the conspiracy or physically inflict any of the injuries on Pennington might be somewhat mitigating, but her central role in these serious offenses merits a significant period of detention.

When considering Ashley Jenkins's history and characteristics, there are several

38

mitigating factors.  Ashley Jenkins has not had an easy life.  She was not as fortunate as Anthony to have been rescued from the custody of her parents, who were indigent and drug abusers.  Neither of her parents worked and both, in her words, "drew checks" from the government, causing the family to be of low means.  When she was twelve years old her mother went missing.  A several week search ensued in which Ashley and her family looked for their mother, who was found murdered in an embankment near the location of Kevin Pennington's assault.  At the trial of her mother's murderers, it emerged that her mother likely died in a dispute over a couple pills.  Ashley was in the Courtroom to hear a recording of her mother's last words and see pictures of her murdered body.  This was doubtlessly a traumatic experience, and one that her examining psychologist opines led to periods of depression for which Ashley turned to drugs as a coping mechanism.  As Ashley abused drugs, the PSR indicates that she also was on the receiving end of physical abuse from men in her personal relationships.  Combined, all of these circumstances likely made it more difficult for Ashley to make the right decisions.  However, the law requires and expects people to make good decisions even when it is hard.  Thus, while these characteristics do not excuse Ashley's conduct, the Court does find them to be mitigating.

It should also be noted that though she did not wish to speak at the preliminary sentencing hearing, the Government did indicate that Ashley Jenkins had written a letter of apology to Kevin Pennington early on in this case.  Along with her acceptance of responsibility, this act is a positive and encouraging sign.

**5**

Again, the sentencing options most appropriate here is incarceration followed by supervision.  It is the judgment of the Court that this is required to provide a sentence that is sufficient to comply with the purposes of Section 3553.

**6**

As for the need to avoid unwarranted disparity,  Ashley Jenkins should not receive a harsher or more lenient sentence just because she is appearing before this Court.  Thus, this sentence should be significant, but due to the mitigating factors of her specific circumstances discussed above, it will be below the range suggested by the Guidelines.

**7**

Finally, to the extent possible, the victim in this case should be compensated for his injuries.  The PSR assesses the restitution amount at $7,513.81, the amount of medical care costs incurred by Mr. Pennington.  However, at the preliminary sentencing hearing, the United States indicated that additional time would be necessary to arrive at the actual amount of restitution in this matter.  As such, the parties shall have seventy (60) days to inform the Court of an agreement on the issue of restitution or to make a motion for a restitution hearing to set that amount.

Therefore, the Court will now impose the sentence of Mable Ashley Jenkins, and if there is no objection it will be imposed as stated.  Pursuant to the Sentencing Reform Act of 1984 as modified by the subsequent case law, the Court finds the following sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a). Accordingly, it is the judgment of the Court that the defendant, Mable Ashley Jenkins, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 100 months on Count One and 100 months on Count Two, to be served concurrently for a total term of 100 months.[4]

---

[4] The sentence imposed by the Court in the case of Mable Ashley Jenkins also included a number of additional conditions that were specifically articulated on the record and that shall be incorporated into the judgment.

**D**

The Court finally turns to the Sentencing of Alexis Leeann Jenkins.  Though it took some time for the initial defendant to be convicted of violating the Hate Crime Prevention Act's prohibition on willfully causing bodily injury to another because of sexual orientation, the second conviction came the day after the first.  On April 11, 2012, Alexis Leeann Jenkins pled guilty to a two-count Information regarding the same criminal conduct and that contained identical charges to those previously discussed in the case of her sister-in-law, Ashley Jenkins.

**1**

When the Guidelines were calculated by the probation officer, the two female Jenkins co-defendants also shared the same three enhancements and criminal history category.  Thus, with a total offense level of 36 and a criminal history category of I, the range proposed by the Guidelines is 188 to 235 months.

Though discussed in reference to Ashley, it is important to note again that at the preliminary sentencing hearing, the United States made a motion for a three level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a).  Specifically, this three level reduction reflects the fact that when Alexis decided to plead guilty, she received credit for having accepted responsibility for her crime.  As a result, the recommended sentence in the sentencing scheme that results in the recommendation is less than it would have been had she have gone to trial and been convicted of the same crime to which she pled guilty.  This reduction requires a motion from the Government, and the Court granted that motion at the preliminary hearing.  The three level reduction for acceptance of responsibility was anticipated in the PSR and recommendation articulated above.

At the preliminary sentencing hearing Alexis Jenkins indicated that she had reviewed the

41

PSR with her counsel and understood it.  She indicated that she had no objection to the PSR's calculation or to the three enhancements applied.  For the reasons previously stated, the Court finds the PSR for Alexis Jenkins as calculated by the Probation Office is correct, and the clerk shall be directed to file the PSR under seal in order to protect the privacy of the Defendant.

However, this does not conclude the Court's consideration of the sentencing Guidelines and its policy statements, as the United States has also filed a sealed motion that affects the Guidelines calculation for Alexis Jenkins.  For the reasons stated at the bench during the preliminary sentencing hearing, the Court granted that sealed motion, reducing the total offense level to 30.[5]  When considered in the context of a criminal offense category I, a total offense level of 30 corresponds to a Guidelines range of 97 to 121 months.

**2**

In considering the effect of the policy statements of the Guidelines, the Court notes that Alexis Jenkins was also young, only nineteen years of age at the time of this offense.  U.S.S.G. §5H1.1.  It bears repeating that youth does not excuse her criminal conduct.  The Court does find, however, that the very young age of Alexis Jenkins is a mitigating factor.

**3**

The policy goals of sentencing are at issue in Alexis's sentence as well.  28 U.S.C. § 3553(a)(2).  Not much more can be said about the seriousness of this offense.  Alexis aided and abetted the kidnapping of Kevin Pennington as well as the ensuing assault, which she admits was motivated by his sexual orientation.  Specifically, she entered the house of essentially a stranger, helped Ashley lure him into a truck, and then encouraged the assault against him even as it began

---

[5] Though the Court granted this motion at the Bench, the docket does not reflect that the Government's motion has been resolved.  Therefore, as housekeeping matter, the Court once again grants the Government's sealed motion at Docket Number 47 and the corresponding Sealed Motion for Leave to Seal a document at Docket Number 46.

to become clear that the intent was to take Kevin Pennington's life.  Counsel for Anthony Jenkins has on more than one occasion alerted the Court of the letters from Alexis to Anthony wherein she assumes the blame for the criminal enterprise because her craving for drugs at least partly motivated the visit to Russell Drive to see Kevin Pennington.  There can be no doubt that this is serious behavior, for which a just punishment will necessarily require a substantial period of incarceration.  It must be made clear to Alexis Jenkins and the community that you cannot be a part of this type of behavior without facing serious consequence.

However, while the offense is egregious and Alexis's participation in that offense requires a period of substantial detention, several things about her involvement in the offense and her conduct afterward are mitigating.  Alexis Jenkins did not throw a punch or inflict any physical injury on Kevin Pennington like Anthony and Jason.  Unlike Ashley, she was not a friendly face that provided the connection with Kevin Pennington necessary to lure him into the truck.  It is true that she was present and did encourage the commission of the criminal activity, but her role was of a different nature than that of her codefendants.  In addition, when she spoke in Court, Alexis directed an apology at Kevin Pennington, whose victim impact statement indicated his belief that Alexis Jenkins did feel true remorse for her actions.  This shows some increased awareness of the seriousness of her offense, improved respect for the law, and decreased likelihood that she will be a future threat to the community.  However, the PSR indicates that, along with Ashley Jenkins, she was charged with terroristic threatening, harassment, and menacing when she allegedly approached Keli Jo Deal and threatened to "beat her and leave her for dead…just like they did Kevin Pennington."  Though these charges were dismissed, this encounter is of concern to the Court as it suggests that Alexis's violent behavior towards Pennington was not an isolated incident.

43

During the preliminary hearing, the defendants were given the opportunity of allocution. Like her husband, Alexis Jenkins used this time to apologize to many people including the victim, her family, and the Court.  The Court does not doubt the sincerity of her apology. However, as a result of her conduct, Alexis Jenkins has harmed the community, and she owes society a debt for those past transgressions.  The sentence must be fashioned by the Court to reflect that debt.  And though this will involve a period of detention, due to her youth and the relative brevity of her sentence, Alexis Jenkins will likely have the vast majority her life remaining after she serves this time.  And when she does, she will have paid off that debt to society.  The Court is aware of the difficult family dynamics of this case.  People in her own family might still hold her wrongs over her head, but they have no right to, because, though she did wrong, she will have borne the consequences of those decisions, and has every right to live her life with this debt paid in full.

A lengthy period of detention will not only provide a just punishment and protect the public, but will, perhaps most importantly, give Alexis Jenkins the opportunity to receive treatment in a drug rehabilitation program while incarcerated and then during supervision if necessary.  There were many aspects of the trial of Anthony and Jason that were tragic, but among the most difficult to hear was how deep Alexis Jenkins had fallen into addiction to controlled substances and how it has ravaged her life.  She recounted at trial that on the day of these criminal events she had ingested a cocktail of drugs that included powerful doses of morphine.  In open court letters from Alexis to Anthony contained poetry that expressed her longing and desire for a suboxone strip, which was perhaps the reason she wanted to go to Kevin Pennington's house in the first place.  And substance abuse is not a new vice for this young woman.  In her sentencing memorandum, Alexis states that she began using marijuana and

44

alcohol at age thirteen, and by age fifteen she was "engaging in week-long 'binges' of cocaine base." [R. 45]. These practices ultimately evolved into the opiate and suboxone dependencies that dominated her life at the time of the criminal conduct in this case. The recommended sentence will be crafted to allow Alexis to get help with these drug and mental health concerns. Alexis has tendered to the Court several certificates demonstrating that she is taking advantage of the programs offered at her current facility. This is an encouraging sign, and hopefully when given the tools to do so, Alexis will be able to overcome her struggles with drugs.

## 4

Defendants are sentenced as individuals, so once again the Court must consider the history and characteristics of the person standing in front of it, as well as the nature and circumstances of this specific crime. Not much more can be said about the role Alexis Jenkins played in the commission of this offense. However, additional consideration must be given to Alexis Jenkins's history and characteristics, which the Court finds to be somewhat mitigating. The PSR and the sentencing memorandum for the defendant emphasize the dysfunction of her family that resulted in a lack of parental guidance. Her biological father was not an active participant in her life, and he spent periods of time in custody based on substance abuse and failure to pay child support. Alexis originally grew up in the custody of her mother, who has also been arrested for drug-related offenses. Her mother and step father often went without jobs, rendering the family of low economic circumstances and dependent on services such as public housing to meet their basic needs. Ultimately, her mother filed paperwork to have her declared beyond parental control, which resulted in placement in foster care. She received no stability in this environment as she was moved among several foster families due to behavioral problems.

Alexis has also struggled with various mental health issues including depressive disorder

and oppositional defiant disorder, and has engaged in self-mutilation in the past.  Without getting

into the details, the Court also notes for the record that Alexis reports that she was the victim of

abuse during her childhood.  She married her current husband and co-defendant, Anthony

Jenkins, after only knowing him for two weeks.  She has stated that the reason she did so was to

spite her mother.  Though they had a short courtship and were only married a week at the time of

the offense, Alexis reports that she had experienced domestic abuse from Anthony.

There can be no doubt that Alexis has grown up amid turbulent circumstances, which

would have been difficult for anyone to rise above.  And while these circumstances are

somewhat mitigating in Alexis's case, it must be noted that the law expects people of all

circumstances to make the right decisions even when it is hard.  Because she has failed to do this,

Alexis must face consequences of her actions with the hope that she will be more empowered in

the future to make better decisions, despite her difficult childhood.

**5**

The Court has considered all the sentencing options that are available.  However, as has

been previously discussed, Alexis Jenkins's conduct is such that incarceration is required to

provide a sentence that is sufficient to comply with the purposes of Section 3553.

**6**

Alexis Jenkins too, should not receive a harsher or more lenient sentence just because she

is appearing before this Court.  Thus, this sentence should be significant, but due to the

mitigating factors of her specific circumstances discussed above, it will be below the range

suggested by the Guidelines.

**7**

Finally, in addition to the period of detention there will be a need for restitution, which is

money paid as compensation to victims for the harm done by the defendants.  The PSR assesses the restitution amount at $7,513.81, the amount of medical care costs incurred by the victim in this matter.  However, at the preliminary sentencing hearing, the United States indicated that additional time would be necessary to arrive at the actual amount of restitution in this matter.  As such, the parties shall have seventy (60) days to inform the Court of an agreement on the issue of restitution or to make a motion for a restitution hearing to set that amount.

Therefore, the Court will now impose the sentence of Alexis Leeann Jenkins, and if there is no objection it will be imposed as stated.  Pursuant to the Sentencing Reform Act of 1984 as modified by the subsequent case law, the Court finds the following sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a). Accordingly, it is the judgment of the Court that the defendant, Alexis Leeann Jenkins, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 96 months on Count One and 96 months on Count Two, to be served concurrently for a total term of 96 months.[6]

### III

A juror in the trial of Anthony and Jason Jenkins wrote an article about his experience, which he entitled, "Hate Crime Trial Reveals Deep Dysfunction."  He noted that in the process of getting at the truth of what happened to Kevin Pennington, the evidence at trial proved beyond a reasonable doubt that we continue to struggle as a community with several common social ills. Each defendant in this case grew up amid complete dysfunction in their families and homes.  It was rare for the parents of these defendants to have attained any education or employment; and

---

[6] The sentence imposed by the Court in the case of Alexis Leeann Jenkins also included a number of additional conditions that were specifically articulated on the record and that shall be incorporated into the judgment.

most accepted some form of government assistance.  Tragically, most, though not all, of those who were supposed to stand as an example for these four defendants, to provide for them, to make them feel safe; instead, abused both drugs and those in their care.  And if the truth be told, none of that is the fault of the four sentenced today.  Nevertheless, despite experiencing the devastation these tragic behaviors caused in their own lives, these defendants made many of the same choices that perpetuate a cycle – a cycle that leads to too many out of school and work and into public assistance and drugs.

Sentencing in federal court does not pretend to solve these systemic issues facing our community.  But it does do this:  punish the misdeeds of four members of this community, provide them with help if they choose to accept it, and send a message to all others that regardless of your life's circumstances, the reckless abuse of drugs is no antidote to the pain of your life.

For these four, the consequences of their choices were violent decisions filled with hate, made on a dark night on the side of a mountain.  These decisions have forever changed their lives and that of Kevin Pennington.  And choices like this change us all.  We feel less noble and less secure in a world where bigotry and substance abuse and violence too often collide.  Just societies choose not to live this way and hold accountable those that do.  And that is what this Court has done here.

This 20th Day of June, 2013.



**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**